UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CIVITAS MASSACHUSETTS REGIONAL CENTER, LLC, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 21-10344-LTS |
| ALEJANDRO MAYORKAS et al., | ) ) ) | |
| Defendants. | ) ) | |

ORDER ON MOTION TO DISMISS OR TRANSFER AND
MOTION TO DISMISS FOR LACK OF JURISDICTION (DOC. NOS. 22, 29)

January 19, 2022

SOROKIN, J.

The Plaintiffs, eight Regional Centers and twenty-two New Commercial Enterprises ("NCEs"), filed the present suit against the Secretary of the Department of Homeland Security ("DHS") and U.S. Citizen and Immigration Services ("USCIS") officers alleging various claims arising from a USCIS policy concerning the EB-5 Regional Center Pilot Program. In response, the Defendants moved to dismiss the complaint or, alternatively, to transfer the case to the District Court for the District of Columbia where a similar case is pending. Doc. No. 22.[1] The Defendants have since filed a second Motion to Dismiss, contending that the Court lacks jurisdiction to hear the case because USCIS's authority to administer the Regional Center Pilot Program lapsed on June 30, 2021 and has not been reauthorized by Congress. Doc. No. 29. The Court addresses each of these Motions in turn.

---

[1] Citations to "Doc. No. __ at __" reference items appearing on the court's electronic docketing system, and pincites are to the page numbers in the ECF header.

I.   BACKGROUND

This case arises from a policy change to the Regional Center Pilot Program ("the Program" or "the Pilot Program") administered by USCIS.  The Plaintiffs' allegations are outlined below.

The EB-5 visa program provides a path to legal permanent resident ("LRR") status for foreign investors who invest $1.8 million (or $900,000 in a high unemployment or rural area) in NCEs that create at least ten jobs for U.S. workers.  Doc. No. 11 ¶ 46.  In 1992, Congress created the Pilot Program, which, inter alia, "allows foreign investors who invest in NCEs affiliated with USCIS designated regional centers to meet the 10-jobs-per-investor requirement by counting indirect jobs—i.e. jobs that are created outside of the NCE."  Id. ¶ 47.  One effect of the Program is that Regional Centers are empowered to pool the investments of many investors in order to fund large-scale projects.  Id. ¶ 48.  Typically, an investor will invest in an NCE, which, in turn, will "make a loan or investment into" a Job-creating Enterprise ("JCE").  Id. ¶ 50.  Both the employees hired by the NCE and the indirect jobs created by the JCE as a result of the investment are counted towards the 10-job-per-investor requirement.  Id. ¶ 47.

Obtaining LPR status under the Pilot Program is a multistage process.  First, the investor must file a Form I-526, Immigrant Petition by Alien Entrepreneur.  Id. ¶ 54.  Upon approval of the I-526, the investor becomes eligible to receive an EB-5 visa.  Id.  Next, the investor must file a Form I-495, Application to Register Permanent Residence or Adjust Status (for those in the U.S.), or a Form DS-260, Application for Immigrant Visa and Alien Registration (for those outside the U.S.).  Id.  Finally, if the investor is approved for adjustment of status or admission on an EB-5 visa, the investor obtains conditional permanent resident status for two years.  Id.  At the end of this two-year period, the investor must file a Form I-829, Petition by Entrepreneur to

Remove Conditions on Permanent Resident status.  Id.  If the investor has made a qualifying investment and complied with the EB-5 investment requirements, the Form I-829 petition will be approved and the investor will become a LPR.  Id.  A requirement of the Pilot Program is that the investment must be sustained "at risk" for the entire duration of the two-year period of conditional permanent resident status.  Id. ¶ 60.

The high demand for EB-5 visas overall as well as country-level caps on the number of visas granted each year has produced an enormous backlog of petitions, especially for citizens of China, India, and Vietnam.  Id. ¶¶ 55-56.  As a result, investors may wait years to obtain LPR status.  Id. ("[T]he estimated wait for a Chinese national who files an EB-5 petition today is 15-18 years.").  The investor's initial investment often creates the required number of jobs well before the I-526 or I-829 petition is approved.  Id. ¶¶ 60, 152.  Due to the mandate that the investment remain at risk for the entire duration of the two-year conditional period, however, USCIS has issued policy guidance allowing the initial investment to be "redeployed" into another project once the required jobs have been created.  Id.

According to the Plaintiffs, the concept of redeployment has caused significant confusion among regional centers and other stakeholders.  See id. ¶¶ 169-74, 171-74.  Though the Program requires that the initial deployment of an investment and job creation occur within the regional center's geographic territory (id. ¶ 157), until recently USCIS had not taken a definitive stance on whether this regional requirement applies to redeployments (id. ¶ 156).  In fact, a June 2017 Policy Manual Update clarifying the redeployment requirement did not explicitly mention a geographic restriction for redeployment.  Id.  Under the assumption that no such restriction applied, the Plaintiffs redeployed funds outside their geographic region.  Id. ¶¶ 61-126.

In July of 2020, USCIS published a policy "clarification" ("the 2020 Policy") stating that a redeployment must fall within the geographic territory of the regional center.  Id. ¶¶ 186-89.  The policy is retroactive and thus applies to I-526 and I-829 petitions filed before and after the 2020 policy's publication.  The basis for one of the Plaintiffs' claims is that the policy did not undergo the notice-and-comment rulemaking process required of regulations pursuant to the Administrative Procedure Act.

The Plaintiffs contend that this policy change has created the risk that USCIS will deny the I-526 and I-829 petitions filed by investors whose investments have been redeployed outside the Regional Centers' geographic area.  Id. ¶ 233-34.  More specifically, "Plaintiffs have 188 investors whose money had previously been redeployed outside of the regional centers' geographic territory, who have or will have an I-526 or I-829 pending on or after July 24, 2020."  Id. ¶ 129.  In addition, the Policy creates difficulties for NCEs by "substantially limit[ing] the pool of possible redeployment options available," placing their duties to invest responsibly and ensure that investors obtain LPR status in conflict and exposing them to lawsuits from investors.  Id. ¶¶ 235-44.

The Plaintiffs' complaint alleges that the 2020 Policy violates the Administrative Procedure Act, Due Process, and the Federal Vacancies Reform Act, and requests that the Court enter a declaratory judgment that the 2020 Policy was unlawful, issue an order setting the Policy aside, enjoin the Defendants from applying the Policy to I-526 or I-829 Petitions pending on or before its publication.

II.   LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  Ashcroft

v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The complaint must also "set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'"  Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997) (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  Courts must "take all factual allegations [in the complaint] as true and . . . draw all reasonable inferences in favor of the plaintiff." Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007).

A motion to dismiss for lack of subject matter jurisdiction brought pursuant to Rule 12(b)(1) is reviewed under a standard similar to that governing Rule 12(b)(6) motions.  Murphy v. U.S., 45 F.3d 520, 522 (1st Cir. 1995).  A party invoking the jurisdiction of a federal court bears the burden of proving its existence.  Id.

III.    DISCUSSION

   A.    Mootness

In their second Motion to Dismiss, the Defendants contend that the Plaintiffs' case is non-justiciable because USCIS's authorization to administer the EB-5 Regional Center Program at issue lapsed on July 1, 2021.  Doc. No. 31 at 2; see also EB-5 Immigrant Investor Program, U.S. Citizen and Immigration Services, https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program (stating that "[s]tatutory authorization for the EB-5 Immigrant Investor Regional Center Program ended at midnight on June 30, 2021").  Though House and Senate members have introduced proposed legislation to reauthorize the Program, Congress has not yet taken action on the bills.  S.831 - EB-5 Reform and Integrity Act of 2021, Congress.gov, https://www.congress.gov/bill/117th-congress/senate-

bill/831;  H.R. 2901: EB-5 Reform and Integrity Act of 2021, Govtrack.us,

https://www.govtrack.us/congress/bills/117/hr2901.

"A case is moot when the issues are no longer live or the parties no longer have a legally cognizable interest in the outcome."  Horizon Bank & Tr. Co. v. Massachusetts, 391 F.3d 48, 53 (1st Cir. 2004).  In other words, "a case is moot when the court cannot give any 'effectual relief' to the potentially prevailing party."  Id. (quoting Church of Scientology of California v. United States, 506 U.S. 9, 12 (1992)).  According to the Defendants, the lapse in statutory authorization renders this case moot because both the Court and USCIS are powerless to effectuate the relief that the Plaintiffs seek, namely halting the application of the 2020 Policy.  Doc. No. 31 at 2.  The Defendants are correct that USCIS has paused its review of investors' I-526 petitions in response to statutory lapse.  EB-5 Immigrant Investor Program, U.S. Citizen and Immigration Services, https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program (explaining that I-526 Petitions associated with the Program filed after July 2, 2021 will be rejected).  As the Plaintiffs point out, however, USCIS continues to accept and review I-829 petitions and thus may apply the challenged 2020 Policy to such petitions.  Id. ("We will still accept and review Form I-829, Petition by Investor to Remove Conditions on Permanent Resident Status, including those filed on or after July 1, 2021.").

Accordingly, the Motion to Dismiss for Lack of Jurisdiction (Doc. No. 29) is DENIED IN PART and ALLOWED IN PART. The case is moot as to the 2020 Policy's application to I-526 Petitions, but there remains a live controversy with respect to the 2020 Policy's application to I-829 Petitions, which are still being reviewed by USCIS.[2]

---

[2] The Plaintiffs' recently filed Notice of Supplemental Authorities further bolsters the Court's conclusion.  Doc. No. 38.  In it, the Plaintiffs direct the Court's attention to an update to USCIS's website indicating that USCIS would continue to accept and review Form I-924As, Regional Center annual certification forms, including those filed on or after July 1, 2021.  Id. at 1; see also I-924A Annual Certification of Regional Center, U.S. Citizen and Immigration

B. <u>Ripeness</u>

In their second challenge to the justiciability of this action, the Defendants argue that the case is not yet ripe for adjudication because the Plaintiffs have not alleged that the 2020 Policy has been or will imminently be applied to their investors.  <u>See</u> Doc. No. 23 at 18.  In the administrative law context, ripeness doctrine is intended to "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  <u>Nulankeyutmonen Nkihtaqumikon v. Impson</u>, 503 F.3d 18, 32 (1st Cir. 2007) (quoting <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 148-49 (1967)).  Courts apply a twofold test when determining the ripeness of a particular action, assessing both the "fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration."  <u>Id.</u> (quoting <u>Doe v. Bush</u>, 323 F.3d 133, 138 (1st Cir.2003)).

As the complaint makes clear, the Plaintiffs are already in the midst of redeploying investment funds outside of their geographic regions.  Doc. No. 11 ¶ 129.  The Plaintiffs further point out that the 2020 Policy has an immediate impact on their actions, forcing them to alter their current redeployment practices or face the risk that their investors' visa applications will be denied due to noncompliance.  Doc. No. 28 at 11.  These allegations are sufficient to satisfy the hardship prong of the ripeness analysis.  <u>See</u> <u>Ernst & Young v. Depositors Economic Protection Corp.</u>, 45 F.3d 530, 536 (1st Cir. 1995) ("[A]n injury sufficient to impute ripeness may also be found when a plaintiff must presently decide to expend substantial resources which may turn out to be wasted, depending on later clarification of the law.").  As for fitness, the Plaintiffs have

---

Services, https://www.uscis.gov/i-924a.  This development shows that portions of the Program continue to operate despite the lapse in statutory authorization.

established the matter is ripe for judicial review, especially where, as here, neither side contends that further factual development is required. See id. (noting that courts may "exhibit a greater willingness to decide cases that turn on legal issues not likely to be significantly affected by further factual development"). The Motion to Dismiss (Doc. No. 23) is DENIED insofar as the Defendants contend the dispute is not ripe for adjudication.

    C.    Venue

The Defendants also argue that the case should be dismissed or transferred to the District Court for the District of Columbia where a similar challenge to the 2020 Policy was filed in February 2021, approximately one month prior to the Civitas complaint. See U.S. Immig. Fund - NY, LLC., v. Mayorkas, Case No. 1:21-cv-00358-CKK (D.D.C. filed Feb. 9, 2021). U.S. Immigration Fund challenges the same 2020 USCIS policy, raises four of the five claims at issue here, and was filed by the same counsel. Doc. No. 23-1. As the Plaintiffs point out, however, U.S. Immigration Fund was brought by entirely different regional centers and NCEs, none of which are parties to the present lawsuit. Doc. No. 28 at 28. The Defendants' Motion is DENIED because, as explained in more detail below, there is not a sufficient basis under the prior-pending action doctrine, the first-to-file rule, or Section 1404(a) to warrant transfer.

"Under the prior-pending action doctrine, 'the pendency of a prior action, in a court of competent jurisdiction, between the same parties, predicated upon the same cause of action and growing out of the same transaction, and in which identical relief is sought, constitutes good ground for abatement of the later suit.'" Quality One Wireless, LLC v. Goldie Grp., LLC, 37 F. Supp. 3d 536, 540 (D. Mass. 2014) (quoting O'Reilly v. Curtis Pub. Co., 31 F. Supp. 364, 364-65 (D. Mass. 1940). Though the "parties in the two suits need not be identical," they must share "a sufficient congruence of interests" for the doctrine to be applicable. Id. at 541. The Defendants

have failed to identify any authority suggesting that the prior-pending action doctrine applies in a case such as this where there is no overlap between the plaintiffs in the first-filed and later-filed actions.  The U.S. Immigration Fund plaintiffs are not only unrelated regional centers and NCEs but are in some cases direct competitors of the Civitas plaintiffs.  Doc. No. 28 at 27.  Thus, the application of this discretionary and rarely invoked doctrine is inappropriate here.  See Qutab v. Kyani, Inc., 324 F. Supp. 3d 243, 245 (D. Mass. 2018) (noting that the prior pending action doctrine "is not widely used in this district").

For similar reasons, the Court denies the Defendants' request for transfer pursuant to the first-to-file rule.  The Rule allows courts to stay, transfer, or dismiss a pending action when a previously filed case involves substantially similar parties and issues.  Thakkar v. United States, 389 F. Supp. 3d 160, 170 (D. Mass. 2019).  Like the prior-pending action doctrine, the rule is most often applicable "when Party A sues Party B in one court, and Party B (often soon thereafter) sues Party A in a different court, and the issues in each action are the same."  Quality One Wireless, LLC, 37 F. Supp. 3d at 540.  Though the issues in the present suit and U.S. Immigration Fund are undeniably similar, "the plaintiffs are wholly separate and unrelated entities doing business in different states and thus impacted by the Rule change in different ways."  Behring Reg'l Ctr. LLC v. Wolf, No. 20-CV-09263-JSC, 2021 WL 1164839, at *2 (N.D. Cal. Mar. 26, 2021).  In light of the divergent interests of the plaintiffs in these cases, the similarly of the issues alone does not warrant transfer under the Rule.

Finally, 28 U.S.C. § 1404(a) allows a court to transfer a case to another district where it might have been brought "for the convenience of parties and witnesses, [and] in the interest of justice."  "A presumption in favor of plaintiff's choice of forum exists, and the burden of proving that transfer is warranted rests with the defendant."  Princess House, Inc. v. Lindsey, 136 F.R.D.

16, 18 (D. Mass. 1991). The Defendants have failed to satisfy this burden through proof of circumstances, such as the location of the witnesses or evidence, sufficient to overcome this presumption. Id. at 19. As the Plaintiffs note, their claims revolve around legal questions and require little in the way of testimony or discovery outside of the administrative record. Doc. No. 28 at 32.

More fundamentally, the application of such doctrines to this case would create an unreasonable expectation that cases bringing similar or identical claims must be consolidated in the venue where the first action was filed regardless of the similarity of the plaintiffs involved. Such an expectation would fly in the face of the presumption in favor of the plaintiff's choice of forum and the general public policy against incentivizing a "race to the courthouse." Transcanada Power Mktg., Ltd. v. Narragansett Elec. Co., 402 F. Supp. 2d 343, 347 (D. Mass. 2005).

Accordingly, the Motion to Transfer Venue is DENIED.

D. The APA Claims

The Defendants next seek to dismiss the Plaintiffs' APA claims, arguing: (1) that the 2020 Policy is not reviewable by the Court because it is not a final agency action and, (2) that the procedural deficiencies alleged by the Plaintiffs are meritless because the 2020 Policy is an interpretive rule not subject to the APA's procedural requirements. Doc. No. 23 at 19. The Court addresses each argument in turn.

1. *Finality*

Under the APA, a Court may review only "final agency actions." 5 U.S.C.A. § 704 (West). The test for finality includes two components. First, "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or

interlocutory nature." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citations and internal quotation marks omitted).  Second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Id. (citations and internal quotation marks omitted).  As described in detail below, the Court finds that the 2020 Policy is a final agency action subject to the Court's review.

Turning first to the issue of consummation, the Court finds the 2020 Policy to be the Defendants' definitive stance on the issue of redeployment outside of a Regional Center's geographic territory.  The 2020 Policy states: "because a regional center has 'jurisdiction over a limited geographic area,' further deployment must occur within the regional center's geographic area[.]" Policy Manual Chapter 2 - Eligibility Requirements, U.S. Citizenship and Immigration Services,  https://www.uscis.gov/policy-manual/volume-6-part-g-chapter-2.  A reasonable interpretation of this "unequivocal" language leads to the conclusion that USCIS has reached a final determination on the redeployment issue.  Akebia Therapeutics, Inc. v. Becerra, No. 19-CV-12132-ADB, 2021 WL 2903086, at *11 (D. Mass. July 9, 2021).  Though the Defendants claim that the policy has not been applied to any of the Plaintiffs' investors and may thus continue to evolve, they have not seriously indicated that they are considering changing or further developing it.  In addition, the 2020 Policy presents potential legal consequences for investors, who may face denial of their petitions due to noncompliance, as well as for the Plaintiffs, who now must alter their redeployment practices to adhere to the Policy.  See U.S. Army Corps of Engineers v. Hawkes Co., 578 U.S. 590, 600, (2016) (plurality opinion) (finding final an agency's approved jurisdictional determination ("JD") that a property contained navigable waters because, inter alia, "while no administrative or criminal proceeding can be brought for failure to conform to the approved JD itself, that final agency determination not only

11

deprives respondents of a five-year safe harbor from liability under the Act, but warns that if they discharge pollutants onto their property without obtaining a permit from the Corps, they do so at the risk of significant criminal and civil penalties").

Thus, the Plaintiffs have satisfied the second prong of the finality analysis and the Defendants' Motion to Dismiss is DENIED insofar as it challenges the finality.

2. *Procedural Deficiencies*

While the APA requires publication of proposed legislative rules followed by a period of public notice and comment, its exempts "interpretive rules" from such procedures. 5 U.S.C. § 553(b)(B) (West). As a result, significant procedural ramifications flow from the categorization of a rule as "legislative" or "interpretive." Courts in this Circuit have defined a legislative rule as one that "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." La Casa Del Convaleciente v. Sullivan, 965 F.2d 1175, 1178 (1st Cir. 1992). As many courts have noted, however, the precise point at which "a rule transitions from being interpretive to being legislative" is a question "enshrouded in considerable smog." New Hampshire Hosp. Ass'n v. Azar, 887 F.3d 62, 70 (1st Cir. 2018) (quoting La Casa Del Convaleciente, 965 F.2d at 1177). In an attempt to clear the smog, courts in the First Circuit consider a number of factors in the analysis, including: the words of the statute the agency claims to interpret, the agency's explanation for adopting the policy, whether the policy is inconsistent with another regulation or statute, the policy's place in the larger statutory and regulatory scheme, and the pragmatic consequences that result from the rule's categorization as either interpretive or legislative. Id. at 71-74 (1st Cir. 2018) (applying these five considerations).

Congress established the Pilot Program in 1992. See Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993, Pub. L. No. 102-395, §

610(a) (1992). According to the statute, "[s]uch pilot program shall involve a regional center in the United States for the promotion of economic growth, including increased export sales, improved regional productivity, job creation, and increased domestic capital investment." Id. Congress later amended this language in 2002, adding: "[a] regional center shall have jurisdiction over a <u>limited geographic area</u>, which shall be described in the proposal and consistent with the purpose of <u>concentrating pooled investment in defined economic zones</u>." 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107-273 § 11037(a)(3) (2002) (emphasis added). The corresponding regulation reflects the geographic focus of the Program and requires that regional centers applying to take part in the Program submit a proposal describing, <u>inter alia</u>, "how the regional center focuses on a geographical region of the United States, and how it will promote economic growth through increased export sales, improved regional productivity, job creation, and increased domestic capital investment." 8 C.F.R. § 204.6(m)(3)(i). Investors seeking a visa must demonstrate that they have invested with an approved regional center. Id. § 204.6(j).

The 2020 Policy at issue here pertains to a regional center's redeployment of the initial investment funds once the job creation requirement has been satisfied. As discussed previously, the concept of redeployment is necessitated by the regulatory requirement that the investment remain "at risk" for the entirety of the conditional release period. 8 C.F.R. § 204.6(j)(2). The 2020 Policy states, in relevant part,

> Consistent with precedent case decisions and existing regulatory requirements, further deployment must continue to meet all applicable eligibility requirements within the framework of the initial bases of eligibility, including the same new commercial enterprise and regional center. In addition, <u>because a regional center has "jurisdiction over a limited geographic area," further deployment must occur within the regional center's geographic area</u>, including any amendments to its geographic area approved before the further deployment.

Policy Manual Chapter 2 - Eligibility Requirements, U.S. Citizenship and Immigration Services, https://www.uscis.gov/policy-manual/volume-6-part-g-chapter-2 (emphasis added).

The Plaintiffs do not dispute that "the statute, regulations and precedent decisions define a regional center geography requirement for initial deployment based on the job creation requirement." Doc. No. 11 ¶ 157. Rather, they contend that the 2020 Policy is a legislative rule because both the statute and the relevant regulation are silent on the issue of redeployment and any geographic limitations that might apply to it. Doc. No. 28 at 25. The Defendants counter that a geographic requirement is inherent in the very name of the program and that the 2020 Policy does nothing more than apply the existing law's jurisdictional requirement to the issue of redeployment. Doc. No. 23 at 20-22. For the reasons explained below, the Court finds the Defendants' argument more persuasive.

The First Circuit has noted that "where Congress has specifically declined to create a standard, the [agency] cannot claim its implementing rule is an interpretation of the statute" rather than a legislative rule. New Hampshire Hosp. Ass'n, 887 F.3d at 71 (quoting Mendoza v. Perez, 754 F.3d 1002, 1022 (D.C. Cir. 2014)). Here, Congress did not "specifically decline" to define the jurisdiction of regional centers. It did just the opposite, clearly stating that regional centers have limited jurisdictions. The Defendants have done nothing more than apply this existing jurisdictional standard to the issue of redeployments. For similar reasons, it is clear that the 2020 Policy is not a substantive rule intended to fill a statutory gap, id. at 73, but rather an interpretation of existing statutory and regulatory requirements intended to address "an area of ambiguity," Warder v. Shalala, 149 F.3d 73, 80 (1st Cir. 1998). Compare New Hampshire Hosp. Ass'n, 887 F.3d at 71 (finding that an agency engaged in legislative rule-making when it defined

14

a term used but left undefined in the statute), with Warder, 149 F.3d at 79-83 (finding that an agency's administrative ruling was interpretive when it relied on existing statutory and regulatory classifications to categorize certain medical devices as "durable medical equipment" rather than "braces" for the purposes of Medicare reimbursement).

Furthermore, the language of the 2020 Policy suggests that USCIS was engaged in interpretation, not policy-making.  Quoting the statute that established the program, the Policy states: "because a regional center has 'jurisdiction over a limited geographic area,' further deployment must occur within the regional center's geographic area." Policy Manual Chapter 2 - Eligibility Requirements, U.S. Citizenship and Immigration Services, https://www.uscis.gov/policy-manual/volume-6-part-g-chapter-2.  The 2020 Policy's explicit reliance on the statute suggests an "interpretive methodology" rather than a discretionary one.  New Hampshire Hosp. Ass'n, 887 F.3d at 72.

Finally, the Policy is consistent with the existing statutory and regulatory landscape and "does not stake out any ground 'the basic tenor of which [was] not already outlined in the law itself.'"  Warder, 149 F.3d 73 at 80-81 (alteration in original) (quoting La Casa Del Convaleciente, 965 F.2d at 1178).  The Plaintiffs concede that geographic restrictions apply to a Regional Center's initial deployment of an investment prior to the fulfillment of the job creation requirement.  Doc. No. 11 ¶ 157.  The 2020 Policy simply extends this principle to redeployments and is thus in-step with the jurisdictional requirements of the statute.

The Court hesitates only insofar as certain "pragmatic considerations," New Hampshire Hosp. Ass'n, 887 F.3d at 73, lean in favor of the Plaintiffs' position.  Such pragmatic considerations include the potential impact of the 2020 Policy on investors' petitions and the Defendants' initial failure to take a stance on the geographic limitations of redeployment (Doc.

No. 11 ¶ 156). Nevertheless, the Court finds that these pragmatic considerations carry less weight in light of the other factors analyzed here, all of which suggest that the 2020 Policy is interpretive.

Therefore, the Motion to Dismiss ALLOWED insofar as the 2020 Policy is an interpretive rule not subject to the APA's procedural requirements.

IV. CONCLUSION

Accordingly, the Second Motion to Dismiss (Doc. No. 29) is DENIED and the first Motion to Dismiss (Doc. No. 22) is ALLOWED for the reasons stated above. In their opposition, the Plaintiffs note that the "Defendants have not presented a 12(b)(6) challenge to Plaintiffs' claims of a violation of the FVRA, improper retroactive application of the new policy or arbitrary and capricious nature of the new policy." Doc. No. 23 at 18 n.1. Thus, the parties shall file a joint status report within seven days stating their joint or separate provisions regarding what, if anything, remains of the case and the suggested procedure or schedule for further proceedings.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge